UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PAUL BROMM,<br><br>Plaintiff,<br><br>v.<br><br>LEWIS COUNTY, et. al.,<br><br>Defendants. | CASE NO. 3:26-cv-05384-BHS<br><br>ORDER |

This matter is before the Court on defendants Warren McCleod, Jonathan Meyer, Robert Snaza, and Sean Swope's Motion for Summary Judgment. Dkt. 26.

## I. BACKGROUND[1]

Plaintiff Paul Bromm was employed as a part-time Deputy Coroner with Lewis County. After conservative activist and media personality Charlie Kirk was shot in September 2025, Bromm shared memes and made other posts on his Facebook that appeared to make light of the killing, even suggesting it was deserved. Bromm was

[1] A more detailed accounting of the factual and procedural history can be found in the Court's recent order denying Lewis County and the City of Centralia's Motion to Dismiss, Dkt. 42.

placed on administrative leave and then terminated for his posts. Bromm sued Lewis County, the City of Centralia, and five individual defendants, asserting 42 U.S.C. § 1983 claims premised on alleged violations of his First Amendment right to free speech, and that defendant Commissioner Sean Swope "doxed" him in violation of RCW 4.24.792. Four of those individual defendants—Coroner Warren McCleod, Commissioner Sean Swope, Sheriff Robert Snaza, and Prosecuting Attorney Jonathan Meyer—now move for summary judgment.

## II. DISCUSSION

### A. Defendants Swope, McCleod, Snaza, and Meyer's motion for summary judgment

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The moving party bears the initial burden of showing that there is no evidence that supports an element

essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

There is no requirement that the moving party negate elements of the non-movant's case. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Once the moving party has met its burden, the non-movant must then produce concrete evidence, without merely relying on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477 U.S. at 248.

Bromm accuses each individual defendant of conspiring to deprive him of his First Amendment rights and having performed at least one overt act in furtherance of that conspiracy. Dkt. 1 at 57-62. For his part in the events underlying this lawsuit, Meyer invokes the defense of absolute prosecutorial immunity or, in the alternative, qualified immunity. Defendants Swope, McCleod, and Snaza also invoke qualified immunity as a defense to Bromm's First Amendment claims. Lastly, Swope asserts a First Amendment defense to the state law doxing claim against him. The issues are addressed in turn.

**1. Prosecutorial immunity**

Meyer claims his decision to place Bromm on a potential impeachment disclosure list and issue a potential impeachment disclosure (PID) letter—to "*Brady*-list" him, as it is often referred—is an action covered by absolute prosecutorial immunity. Dkt. 26 at 18-21. If true, Meyer cannot be held civilly liable for his conduct, regardless of whether it

was wrongful. *See Imbler v. Pachtman*, 424 U.S. 409, 427 (1976). Bromm argues that Meyer's decision to issue a PID letter was administrative or investigative in nature, rather than advocacy or preparation for a criminal prosecution, and therefore falls on the unprotected side of the line. Dkt. 35 at 1-6. Specifically, Bromm argues that prosecutorial immunity cannot apply to decisions divorced from specific, identifiable prosecutions or charging decisions.

Prosecutorial immunity applies with "full force" to activities that are "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430 (1976). When a prosecutor strays into administrative or investigative work of the type normally performed by police, however, they are protected only by qualified immunity. *Botello v. Gammick*, 413 F.3d 971, 975-76 (9th Cir. 2005). To determine if the challenged action is prosecutorial in nature, or merely administrative, the court looks to the "nature of the function performed," rather than the identity of the actor. *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997). The question is whether Meyer's decision to place Bromm on a *Brady*-list, and to inform Coroner McCleod of that decision, bore a sufficient nexus to the judicial process.

The Ninth Circuit has held that a prosecutor's refusal to pursue cases based on concerns about witness credibility, and their communication of that decision to the individual's employer, is entitled to absolute immunity. *See Roe v. City & Cnty. of San Francisco*, 109 F.3d 578, 583 (9th Cir. 1997). This is true whether the decision is reached with respect to a specific criminal prosecution or as a policy for general application. *See id.* at 583. In *Roe*, a police officer sued prosecutors because they refused to prosecute *any*

of his cases, allegedly in retaliation for a legal memo he had sent them, arguing this violated his First Amendment rights. *See id.* at 580-582. Roe further argued that even if prosecutorial immunity would shield the prosecutor's decisions with respect to specific cases, the immunity should be limited to those "typical, single-case situation[s]," as opposed to a blanket policy of non-prosecution. The Court rejected the distinction and held that a prosecutor's judgment about Roe's credibility as a witness was protected by prosecutorial immunity, even if that decision were applied in a general fashion. *Id.* at 583.

Similarly, in *Botello*, a sexual assault investigator voiced concerns about the reliability of a nurse who the District Attorney's office frequently called to testify in sexual assault cases. Botello alleged that two prosecuting attorneys demanded he "keep his mouth shut" and threatened to retaliate if he continued advocating for oversight measures. *Id.* at 973-74. Botello left his job with the Sheriff's office and took a job with another local police department. Unaware that the police department had already hired Botello, the prosecutors phoned Botello's new employer and tried to sabotage his hiring; made false allegations about Botello's character; demanded that he be excluded from any phase of any investigation; and told the police department they would not file any case where Botello had been involved in the investigation. *Id.* In response to these threats, the police department assigned Botello to desk duty. *Id.* Botello sued.

In reviewing the prosecutors' claim of absolute immunity, the Ninth Circuit broke down the prosecutors' actions into three phases, two of which it held were not eligible for the defense of absolute immunity. First, the court held that the decision to call the police department and attempt to dissuade it from hiring Botello was "simply an attempt to

disrupt an employment decision" and not a prosecutorial function. *Id.* at 977. Second, the court held that the prosecutors demand to the department that Botello not be involved in any phase of any investigation was "in essence dictating to local law enforcement authorities how future criminal investigations should be conducted and staffed—an administrative function." *Id*. However, despite expressing reservations about the breadth and lack of explanation for the prosecutors' blanket decision not to prosecute any case in which Botello had been involved, it applied *Roe* and held that their decision was shielded by absolute immunity, as was the communication of that decision to Botello's employer. *Id.*

Courts have extended prosecutorial immunity to the decision to "*Brady*-list" individuals. For instance, in *Neri v. Cnty. of Stanislaus Dist. Attorney's Off*., No. 1:10-CV-823 AWI GSA, 2010 WL 3582575 (E.D. Cal. Sept. 9, 2010), the plaintiff was placed on a *Brady*-list and was ultimately terminated by his employing agency as a result. He then sued the prosecutor's office, and when it raised the defense of prosecutorial immunity, Neri argued that the decision to *Brady*-list him was unconnected from a specific case, nor did it involve a decision whether to prosecute, and therefore was not sufficiently connected to the judicial process. *Id.* at 3. The court rejected this argument, explaining that "[o]nce information concerning a witness or potential witness comes into the hands of a prosecutor, the prosecutor must evaluate how that evidence affects the witness or potential witnesses" and that "[t]he duty to evaluate remains irrespective of whether the information/evidence is obtained outside an active prosecution." *Id.* at *6 (citing *Roe*); *see also Sampaga v. Snohomish Cnty.*, No. 16-01310-RAJ, 2017 WL

2806836 (W.D. Wash. June 29, 2017) (immunizing prosecutor's decision to *Brady*-list police officer).

Meyer argues that *Roe* controls, and the Court agrees. Meyer attests that he evaluated Bromm's Facebook posts to determine whether they revealed bias or otherwise might need to be disclosed to defense counsel if Bromm were called to testify. Dkt. 28 at 5–6. Meyer concluded that the posts would likely be of interest to defense counsel. *Id.* Meyer further attests that PID letters are issued—and flagged in the office's case management system—whenever issues are identified, regardless of whether the individual is presently or likely to be a witness in the future. Dkt. 28 at 29. These actions are closely analogous to those in the cases previously discussed and are thus embraced by the protection of prosecutorial immunity. And unlike in *Botello*, there is no evidence offered that Meyer demanded or pressured the coroner's office to take employment action against Bromm or demanded that Bromm's role be limited in any way.

Bromm primarily relies on a Sixth Circuit case, *Stockdale v. Helper*, 979 F.3d 498 (6th Cir. 2020), but *Helper* does not help. In that case, the defendant prosecutor, Helper, sabotaged the employment of two police officers she disliked and who she certainly did not want to see promoted to the role of police chief. *Id.* at 500-02. Helper communicated her distaste for the officers to the mayor and the city manager. The city manager asked Helper to put these concerns in writing, and it was only in that letter that Helper told the city manager she would be making *Brady* disclosures in any case in which the officers were involved. The city manager then fired the officers, citing Helper's letter as the "sole reason" for his decision. The officers sued and Helper invoked prosecutorial immunity,

but the Sixth Circuit held it was inapplicable. Of note, the Sixth Circuit held that Helper's "administrative kibitzing"—referring to her pre-*Brady*-letter pressure on the mayor and city manager—did not serve a traditional advocacy role, and when combined with the absence of any justification for *Brady*-listing the officers, Helper's actions had ventured too far afield from the judicial process. *Id.* at 503. But again, there is no evidence that Meyer engaged in this kind of pressure campaign, to the contrary, he has testified that he had no further involvement beyond sending the PID letter. Dkt. 28 at 8. All that is supported by the record is that Meyer added Bromm to the PID list and communicated this decision to Coroner McCleod.[2]

Bromm also argues that Meyer's motion lacked sufficient evidentiary support because Meyer did not include the PID letter or specifically allege that he added Bromm to a PID list (as opposed to just issuing the PID letter). Dkt. 35 at 4-7. Meyer submitted a second declaration with the defendants' reply, clarifying that Bromm was added to the case management system and including a copy of the PID letter. Dkts. 39, 39–1. Bromm argues that this second declaration and the accompanying exhibit are untimely and must not be considered and asks the Court to strike portions of the second declaration, the exhibit, and a footnote in defendants' reply brief that cites to those materials. Dkt. 41. This is unnecessary.

---

[2] Insofar as *Stockdale* treated a prosecutor's communication of their decision to *Brady*-list an individual as less deserving immunity than the underlying decision to *Brady*-list them, this is in tension with the Ninth Circuit's holding in *Roe* and *Botello*, which this Court is bound to follow.

The first Meyer declaration alleges a standard practice of adding individuals who are issued PID letters to his office's case management system so that the office will receive alerts when those individuals are involved in future cases. Dkt. 28 at ¶5. Meyer then alleges that Bromm was issued a PID letter, the obvious implication being that he was added to the case management system. *Id.* at 5-6. Bromm offers no evidence to dispute this. The first Meyer declaration is therefore sufficient, on summary judgment, to support Meyer's claim that Bromm was added to the case management system without resort to the second declaration. Further, the second declaration merely affirms what is clear from the first declaration when Meyer says "[a]ny time I issue a PID letter to a potential witness, a profile is created in our case management system . . . [t]hat occurred after I issued the PID letter in relation to Mr. Bromm, just like with every other PID letter I issue." Dkt. 39 at 2. This is hardly new evidence, but even accepting that it is, Bromm offers no explanation for how he would be prejudiced by its consideration other than the conclusory assertion in his surreply that he "has had no opportunity to respond to this new evidence." Dkt. 41 at 4. Bromm certainly could have used the surreply to respond to that evidence or at least explain why he could not do so within that filing.

As for the PID letter, Bromm argues that Meyer failed to establish his entitlement to qualified immunity because he did not produce the letter itself. Dkt. 35 at 5. The Court disagrees. Meyer adequately described the function of PID letters in his declaration, and based on that description, the Court concludes that they are akin to the communications held to be immune in *Roe* and *Botello*. Further, Bromm did provide the letter with his response brief, and had an opportunity to argue about its significance, so his complaint

about having "no opportunity to respond to this new evidence" is somewhat perplexing. In any case, the letter is now part of the record, and the Court does not see anything in the letter that undermines its conclusion that Meyer is entitled to prosecutorial immunity.

Because Meyer's decision to *Brady*-list Bromm and issue a PID letter to his employer are entitled to prosecutorial immunity, Bromm's arguments about the wisdom of that decision—and even the suggestion that it was motivated by animus—are beside the point. *See Roe*, 109 F.3d at 584 ("a prosecutor's professional evaluation of a witness is entitled to absolute immunity even if that judgment is harsh, unfair or clouded by personal animus.") Meyer cannot be held civilly liable for his issuance of the PID letter and the communication of that letter to Bromm's employer as a matter of law.

**2. Defendants Meyer, Swope, McCleod, and Snaza are entitled to qualified immunity**

The qualified immunity doctrine shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A two-part test resolves claims of qualified immunity by determining whether plaintiffs have alleged facts that "make out a violation of a constitutional right," and if so, whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001)).

Qualified immunity protects officials "who act in ways they reasonably believe to be lawful." *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The reasonableness inquiry is objective, evaluating whether an official's actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *See Graham v. Connor*, 490 U.S. 386, 397 (1989). Even if an official's decision is constitutionally deficient, qualified immunity shields her from suit if her misapprehension about the law applicable to the circumstances was reasonable. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). As a privilege from suit, not merely from liability, qualified immunity "gives ample room for mistaken judgments" and protects "all but the plainly incompetent." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citing *Malley v. Briggs*, 475 U.S. 335 (1986)).

Bromm claims that the defendants retaliated against him for engaging in protected First Amendment activities, thereby violating a well-settled constitutional precept; that government officials are prohibited from "using the authority, influence, or leverage available through public office to impose or cause adverse consequences because of protected speech." Dkt. 35 at 28. This is a true statement as far as it goes, but it frames the question too abstractly. *See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 980 (9th Cir. 1998).

When dealing with first amendment retaliation in public employment claims, the question is not whether the right to be free from first amendment retaliation in public employment is clearly established, but "whether the outcome of the *Pickering* balance so

clearly favored [the plaintiff] that it would have been patently unreasonable for the [officials] to conclude that the First Amendment did not protect their speech." *Id.*; *see also Moran v. Washington*, 147 F.3d 839, 845 (9th Cir. 1998). The Ninth Circuit has noted that "the law regarding [claims implicating *Pickering*] will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity." *Id.* at 847. Bromm's case is not the exception.

Under the *Pickering* test, the court first considers whether the employee spoke on a matter of public concern. *See Moran*, 147 F.3d at 846 (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty.*, 391 U.S. 563 (1968)). If so, the court considers whether the government's interest in promoting the efficient provision of public services outweighs the First Amendment value of the speech in question. *Id.* The second prong is context-specific, and factors in the nature of the employee's role, where and when their speech occurred, the nature of the agency's mission and services, and whether any disruption has occurred or is reasonably likely to occur. On the other side, the Court should consider the relative First Amendment value of the speech—for example, does the speech substantially involve matters of public concern, or is it more akin to an employee grievance? *See Connick v. Myers*, 461 U.S. 138, 152 (1983). Is it commentary on a matter within the scope of the employee's work-related expertise, entitling it to great weight? Or is it expressed in a derogatory manner, entitling it to less weight? *See Thompson v. Cent. Valley Sch. Dist. No 365*, 163 F.4th 654 (9th Cir. 2025), *cert. denied sub nom. Thompson v. Cent. Valley Sch. Dist.*, No. 25-1281, 2026 WL 1855054 (U.S. June 29, 2026).

In *Pickering*, a teacher was fired over a letter he submitted to a local newspaper criticizing school officials on policy matters. The Court held that Pickering's firing was unconstitutional after weighing "the interests of the teacher, as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568. The Court cautioned that "[b]ecause of the enormous variety of fact situations" in which public employees might be disciplined or terminated for their speech, it would not be "either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged." *Id.* at 569.

In *Connick v. Myers*, 461 U.S. 138 (1983), the Court revisited the *Pickering* test, this time upholding the dismissal of a former district attorney, Myers, who had circulated a survey among her coworkers soliciting their thoughts on office policies and personnel, including whether they felt pressured by the office to work in political campaigns. The court held that this last question touched on a matter of public concern, but that Myers had only a limited interest in the speech because the true purpose of the survey was to bolster Myer's position in an employment dispute with her supervisor, Connick. The Court also noted that Myer's choice of location and timing for circulating her questionnaire had resulted in disruption to the workplace. *Id.* at 152. Thus, weighing Myer's first amendment interests against the risk that her actions "would disrupt the office, undermine [Connick's] authority, and destroy close working relationships," the Court held that Myer's speech was not protected, and her termination was proper. *Id.* at 154.

Drawing closer to the facts of this case is *Rankin v. McPherson*, 483 U.S. 378 (1987). After the attempted assassination of President Reagan in 1981, Arda McPherson, a clerical employee working for the constable's office in Harris County, Texas, remarked to her coworker, "if they go for him again, I hope they get him." *Id.* at 381. Unknown to her, another employee was within earshot and reported the conversation to McPherson's supervisor, Constable Rankin. *Id.* at 382. Rankin summoned McPherson, who admitted to having made the statements, and fired her. McPherson brought a § 1983 claim alleging that her firing violated her right to free speech. *Id.* On appeal, the Fifth Circuit held that McPherson's statements were protected, and the Supreme Court affirmed. Applying *Pickering* and *Connick*, the Court first inquired whether McPherson's statement constituted speech on a matter of public concern, concluding that it was because it occurred in the context of a discussion about President Reagan's policies in the wake of a highly publicized assassination attempt. The Court then asked whether "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" outweighed McPherson's interest in having made the comments. *Id.* at 388. The Court held that it did not.

Although McPherson's statements were made in the workplace, there was no evidence that they had interfered with the efficient functioning of the office, unlike in *Connick*. *See id.* at 388-89. Constable Rankin testified that the possibility of interruption had not been a consideration in his decision to fire McPherson, nor had he inquired whether the remark had caused any disruption. *Id.* at 389. There also was no evidence that McPherson had discredited the office by making her statement public, or that her

statement had been overheard by a member of the public. *Id.* Considering the non-public, clerical nature of her role and the absence of any disruption to the office's business or public perception, the Court held that McPherson had been fired simply for the content of her speech and the Constable's belief that she was "unworthy" of employment in his agency, and that this was unlawful. *Id.* at 390. The Court explained that "at some point, such concerns are so removed from the effective functioning of the public employer that they cannot prevail over the free speech rights of the public employee." *Id.* at 391. However, the Court cautioned that even employees with non-public roles could be terminated for their speech if the facts show it "truly injures the public interest," such as where a clerical employee for a law enforcement agency goes on television and identifies themselves as both an employee of that office, and a recruiter for the Ku Klux Klan. *Id.* at n.9 (citing *McMullen v. Carson*, 754 F.2d 936 (11th Cir. 1985)).

In addition to how public-facing the employee's role is, and the context in which their speech occurs, courts consider the nature of the public employer's business when deciding how much weight to afford their interest in avoiding disruptive speech. For example, the government's interest in reducing tension and maintaining close working relationships among its staff in the context of higher education, where a vigorous exchange of ideas, and any attendant tension or discomfort, is an accepted part of college life. *See Reges v. Cauce*, 175 F.4th 1014, 1035-36 (9th Cir. 2026). Conversely, courts have recognized a heightened interest in maintaining "discipline, esprit de corps, and uniformity." *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 908 (9th Cir. 2021).

The relevance of the employee's speech to the scope of their employment, and the language used, are also relevant factors. For example, the value of government employees' speech on matters relating to the agency or field in which they work has been considered the "apex" of First Amendment protection, such as when teachers speak out on issues in the field of education. *Thompson*, 163 F.4th 654 (9th Cir. 2025). Conversely, derogatory speech will be accorded less weight in the *Pickering* balance. *Id.* In *Thompson*, an assistant principal was placed on leave and then demoted for comments he made on Facebook, namely his reaction to the Democratic National Convention, in which he referred to Democrats as "demtards" and suggesting that "the rest of us are sick and tired of your act and going to take you to the woodshed for a proper education." *Id.* at 664-65. The court concluded that Thompson's post could be construed as commentary on a matter of public concern, but that it was "not speech entitled to the highest constitutional protection" due to the disparaging and violent language used. *Id.*; *see also MacRae v. Mattos*, 106 F.4th 122 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2617 (2025) (plaintiff's posts about transgender individuals and immigrants were on a matter of public concern but were entitled to less weigh considering the "mocking, derogatory, and disparaging manner" in which they were conveyed).

Finally, as *Rankin* made clear, there must be evidence that the speech in question had or will disrupt the employer's operations. A government employer may rely on reasonable predictions of future disruption, even if none has yet occurred, but it must "provide some evidence for the court to evaluate whether the government's claims of disruption appear reasonable." *Moser*, 984 F.3d at 909. Courts are more likely to accept a

government's employer's prediction of future disruption if some disruption has already occurred. *Id.*

The question now before the Court is whether, in September 2025, it was so "clearly established" that Bromm's interest in sharing memes about the slaying of Charlie Kirk outweighed the County's interests in maintaining the efficiency and public confidence that it would be unreasonable for the defendants to think otherwise. The Court concludes that Bromm has satisfied the first prong of the *Pickering* test. Viewed in the light most favorable to Bromm, his social media posts constituted commentary on a matter of public concern, namely the assassination of a prominent media figure, and by extension, the views he espoused. *See Rankin*, 483 U.S. at 387 ("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."). Bromm asserts he was pushing back against what he viewed as the undeserved lionization of Charlie Kirk. *See* Bromm Decl., Dkt. 36 at 2 ("With my background in the civil rights movement, I was really opposed to how people were viewing [Kirk] as a civil rights hero . . . I was pushing back on a false narrative about Charlie Kirk that made me upset."). However, the "'public concern' prong is a necessary, but not a sufficient, condition of constitutional protection." *Brewster*, 149 F.3d at 979.

The second prong is whether it was sufficiently clear to the defendants, at the time of their conduct, that their asserted interests in avoiding disruption to their agencies' operations would be outweighed by Bromm's interest in making these posts. *See Moran*, 147 F.3d at 845.

McCleod argue that Bromm's posts caused disruption to the operations of the coroner's office, threatened to undermine investigations, and brought the coroner's office into disrepute. He has supplied some evidence to that effect. For example, McCleod testifies that he received "multiple calls and emails from citizens complaining about Mr. Bromm's posts." Dkt. 27. There is also some evidence that Bromm's posts threatened the working relationship between the coroner's office and its partner agencies. *Id.* at 26-27 (recounting issuance of PID letter and subsequent communications requesting that Bromm's role in investigations be limited). Bromm argues that this disruption was not "widespread or sustained," or that it was self-inflicted because the defendants amplified the reach of Bromm's posts, Dkt. 35 at 18–19, but these are ultimately arguments about how much weight to give the defendants' interests in the balancing test. This is not a case where the government has offered *no* evidence demonstrating actual or reasonably anticipated disruption such that the defendants' hopes of prevailing under *Pickering* would have been doomed from the start.

Further, given the public-facing nature of the coroner's office (and of Bromm's role specifically) and the public nature of his comments, the court concludes that it was at least reasonably non-speculative to anticipate that Bromm's statements would cause disruption in the future. Although the coroner's office is not a law enforcement agency, it frequently works alongside law enforcement, and it does occupy a "unique and sensitive position" having "necessary and constant interactions with the public." *Dible v. City of Chandler*, 515 F.3d 918, 929 (9th Cir. 2008). Bromm's work for the coroner's office was also public-facing, requiring him to interface both with the public and with other

agencies. McCleod Decl., Dkt. 27 at 4-5. Bromm does not deny this. Bromm's Facebook profile also identified him as an employee of the Coroner's office at the time he made the post,[3] and his posts were quickly made public, if indeed they could ever be considered private.[4]

The defendants also argue, and the Court agrees, that Bromm's posts are entitled to less weight in the *Pickering* analysis due to their disparaging tone. Some of the posts were memes that Bromm shared, including one with what appears to a photo of the vocalist for the rock band Filter singing with the text "HEYYYYY Man, Nice Shot!"[5] paired with an image of Charlie Kirk's suspected killer. Dkt. 1 at 3; Dkt. 30–1. Another combined an image of Charlie Kirk with another photo of the spray-painted words "Make Racists Afraid Again" and the outline of a balaclava. *Id.* And a third shows the text "FA+FO=" followed by a picture of Charlie Kirk bleeding from his neck. Dkt. 30–1. The defendants interpret this as a shorthand for the phrase "fuck around and find out," and Bromm does not dispute this. Dkt. 29 at ¶7. The defendants also point to a post in which

---

[3] *See* Dkt. 36 at 2 ("I [Bromm] removed my job affiliation before Sean Swope posted about me and my employment."); Swope Decl., Dkt. 30 at 3 ("I reviewed Mr. Bromm's public Facebook account and saw several things that clearly identified him as a Lewis County employee. First, in this profile he identified himself as an employee of Lewis County. Second, his profile photo showed him in a Lewis County Coroner's Office shirt.")

[4] Bromm asserts that McCleod, as his Facebook friend, had "access to and visibility into Plaintiff's Facebook posts," Dkt. 1 at 17 but does not claim that *only* friends could view his posts. The fact that State Senator McEntire—who Bromm does not allege was a connection on Facebook—was able to share his post suggests that it was public. In any case, the post *did* become public, and the court cannot conclude that the risk of this happening was unexpected, unlike a private verbal communique made where there is no risk of the public overhearing. *See Rankin*, 483 U.S. at 389.

[5] The band Filter released the song "Hey Man Nice Shot" in 1995.

Bromm wrote "I have said it b4- Violence is never the answer but it is part of the equation to get to the answer." Dkt. 30–2. Although Bromm disputes the defendants' characterization of his subjective mindset when sharing these posts, he does not dispute the content of the posts, which are plainly mocking and violent in tone. As such, Bromm's posts are entitled to less weight in the *Pickering* analysis.

On these facts, the Court cannot conclude that McCleod's decision to terminate Bromm violated clearly established law. This conclusion is further supported by the authority cited in the defendants' motion, *MacRae*, 106 F.4th 122 and *Hussey v. City of Cambridge*, 149 F.4th 57 (1st Cir. 2025), *reh'g en banc granted, opinion withdrawn*, 165 F.4th 638 (1st Cir. 2026).

In *MacRae*, the First Circuit held it was permissible for a school district to fire a teacher who shared social media posts that were derogatory toward transgender individuals and immigrants because it posed a reasonable—if not yet realized—threat of disruption to the classroom environment. And in *Hussey* the court held that a police officer could be disciplined over social media posts he made disparaging George Floyd because it was reasonable to believe they posed a threat to the department's relationship of trust with the public.[6] These cases are instructive, particularly because they both held in the government's favor on the merits of the *Pickering* analysis. As noted, the inquiry for purpose of qualified immunity is not whether the government's anticipation of

[6] The First Circuit subsequently granted rehearing *en banc* but has not yet issued a new opinion. In any case, this opinion was in force during the time in which Bromm's speech and resulting termination occurred, and it is therefore relevant to understanding what a reasonable individual would have understood to be permissible under the law at the time.

disruption was reasonable, but whether it was "patently unreasonable," a more lenient standard than the one under which the defendants prevailed in *MacRae* and *Hussey*.

Turning briefly to the remaining defendants, the court is likewise unpersuaded that their conduct violated clearly established law. The Court has already concluded that Meyer's actions are entitled to prosecutorial immunity, and *a fortiori*, would be at least entitled to qualified immunity. It is also far from clear that Sheriff Snaza's decision to restrict Bromm's role in investigations involving homicides or suspicious deaths in response to Bromm's posts and his inclusion on the PID list was a violation of clearly established law. Dkt. 29 at 3–4. Lastly, Bromm offers no authority to support the contention that Swope violated clearly established law by resharing his post, drawing others' attention to it, or even suggesting that others contact his employer, an elected official, if they had concerns. On the contrary, it is doubtful that Swope could be held liable for that conduct consistent with the First Amendment. Further, although the defendants did at various times recognize Bromm's First Amendment rights in broad terms,[7] their statements cannot be interpreted as an admission that firing Bromm would clearly violate his rights under the delicate *Pickering* analysis, which is a legal question for the Court to resolve.

---

[7] Dkt. 35 at 30 (citing Swope Decl. ¶ 7, Ex. C; Snaza Decl. Ex. A; Lunde Decl. ¶ 15, Ex. H; Lunde Decl. ¶ 14, Ex. G).

Defendants McCleod, Swope, Snaza, and Meyer are entitled to qualified immunity. Their summary judgment motion is **GRANTED**, and Bromm's First Amendment conspiracy claims against them are **DISMISSED**.

**3. Bromm's state law doxing claim against defendant Swope fails as a matter of law**

Bromm's final claim arises under RCW 4.24.792 – unauthorized publication of personal identifying information (the "doxing" statute). The doxing statute prohibits the unauthorized publication of "personal identifying information" either with intent or knowledge that the information will be used to harm the individual whose information it is, or with reckless disregard for the risk that the information will be used to harm them. "Personal identifying information" is defined as:

> any information that can be used to distinguish or trace an individual's identity, including without limitation name, prior legal name, alias, mother's maiden name, or date or place of birth, in combination with any other information that is linked or linkable to an individual such as:
>
> (i) Social security number, home address, mailing address, phone number, email address, social media accounts, or biometric data;
> (ii) Medical, financial, education, consumer, or employment information, data, or records;
> (iii) Any other sensitive private information that is linked or linkable to a specific identifiable individual, such as gender identity, sexual orientation, or any sexually intimate visual depiction; or
> (iv) Any information, including without limitation usernames and passwords, that enables access to a person's email accounts, social media accounts, electronic forum accounts, chat or instant message accounts, cloud storage accounts, banking or financial accounts, computer networks, computers or phones, teleconferencing services, video-teleconferencing services, or other digital meeting rooms.

RCW 4.24.792(h). An individual whose information has been shared in violation of the doxing statute has a state law cause of action against the individual or individuals who

shared the information. However, the prohibition does not apply to "providing personal identifying information in connection with an exercise of the right of freedom of speech or of the press." RCW 4.24.472(2)(b).

Bromm alleges that Swope doxed him by identifying him as an employee with the Lewis County Coroner's office (after Bromm had removed that information from his profile) and sharing his employer, Coroner McCleod's email address. Dkt. 1 at 67–69. Swope does not challenge Bromm's claim on its elements but instead argues that he had his own First Amendment right to make his post, making it exempt under RCW 4.24.472(2)(b). The Court agrees. Having concluded that Bromm's original post touched on a matter of public concern, it only makes sense that Swope's responses would be accorded the same treatment. Just as Bromm had an interest in sharing his memes, so too did Swope have an interest in criticizing him, and in communicating that criticism to his constituents. Indeed, Bromm acknowledges that the posts "contained political commentary," but he nonetheless argues that "Swope's First Amendment argument addresses only his initial publication and does not answer the evidence that he later pinned the post to the top of his Facebook page." Dkt. 35 at 42. But Bromm does not explain why a social media post qualifying for First Amendment protection would lose that protection based on how prominently displayed it is.

Even construing the facts in the light most favorable to Bromm, Swope's Facebook post was an exercise of his First Amendment rights and therefore did not violate RCW 4.24.472 as a matter of law. Bromm's state law doxing claim is **DISMISSED**.

**4. Attorney's fees**

The defendants ask the Court to award them attorney's fees, arguing that Bromm's claims against them were "frivolous, unreasonable, or without foundation." Per 42 U.S.C. §1988, the Court may award the prevailing party—in this case, Meyer, Snaza, McCleod, and Swope—reasonable attorney's fees as part of their costs in defending against an action brought under 42 U.S.C. §1983, but only when the plaintiff's action is "frivolous, unreasonable, or without foundation." *Citizens for Free Speech, LLC v. Cnty. of Alameda*, 953 F.3d 655, 658 (9th Cir. 2020) (citation modified). The defendants argue that existing authority strongly supported their arguments that Meyer's conduct was shieled by prosecutorial immunity, and that all defendants' conduct would be covered by at least qualified immunity. The Court is obviously persuaded by their arguments on the merits of those defenses, but this does not mean Bromm's arguments were frivolous.

The Court does not find that Bromm's claims against the individual defendants frivolous, unreasonable, or without foundation. The defendants request for attorney's fees is **DENIED**.

## III. ORDER

The motion for summary judgment filed by defendants Swope, Snaza, Meyer, and McCleod, Dkt. 26, is **GRANTED**. The defendants' request for attorney's fees is **DENIED**.

IT IS SO ORDERED.

//

//

Dated this 14th day of September, 2026.

BENJAMIN H. SETTLE
United States District Judge